## CHICAGO, ST. P., M. & O. RY. CO. v. BRYANT.

(Circuit Court of Appeals, Eighth Circuit. January 7, 1895.)

### No. 358.

1. CARRIERS—UNAUTHORIZED ACT OF YARD MASTER—USE OF PASSENGER TRAIN.

A yard master, after 6 p. m., on being relieved from duty, took a passenger car and engine to give himself and fellow servants a free ride to and from a meeting of theirs, without notice or permission from any officer who had authority to permit the passage of such a train. *Held* that, such act not having been done in the course of his employment, but for his own ends exclusively, and without authority to carry passengers for the company, and having no apparent authority, except possession of the train, the company was not liable as to a passenger for injury to one on the train.

2. SAME—RATIFICATION—PAYMENT OF ENGINEER.

The fact that the engineer on the train was paid for the time spent in running it as extra time is not a ratification by the company of the acts of the yard master in using the train as a passenger train, the payment having been made by direction of the master mechanic, who had no authority relative to the carrying of passengers.

In Error to the Circuit Court of the United States for the District of Minnesota.

Action by Forest E. Bryant, administrator of James Davidson, deceased, against the Chicago, St. Paul, Minneapolis & Omaha Railway Company, for death of deceased. Judgment for plaintiff. Defendant brings error.

Thomas Wilson (S. L. Perrin was with him on brief), for plaintiff in error.

F. B. Kellogg (C. K. Davis, C. A. Severance, M. D. Munn, H. C. Boyeson, and N. M. Thygeson, were with him on brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. The defendant in error, as administrator of the estate of James Davidson, deceased, brought an action in the court below against the Chicago, St. Paul, Minneapolis & Omaha Railway Company, the plaintiff in error, for negligence which he claimed caused the death of Davidson. He alleged in his complaint that the railway company was a common carrier between the Union Depot in St. Paul and a point near to its railroad shops, about a mile and a half westerly from the depot, and that the deceased was killed by its negligence while it was transporting him as a passenger between these points. The answer admitted that the company was a common carrier, but denied that at the time of the accident it was a common carrier of passengers between the points named, denied that the deceased was a passenger on any car operated by it at the time of his injury, denied that it was at that time managing or running any passenger car or cars between those points, and alleged that any injury the deceased suffered was caused solely by his own negligence and the negligence of those who were operating the passenger coach in which he was traveling. The case was tried to a jury, and the close of the testimony the company requested the court to in-

struct the jury to return a verdict in its favor, on the ground that the evidence was insufficient to justify a verdict against it. The court refused to grant this request, and the jury returned a verdict against the company. The first question to be considered, therefore, is whether or not the evidence was sufficient to sustain such a verdict.

This was the second trial of this case. At the first trial, the court, at the close of the administrator's evidence, directed a verdict in favor of the company. On a writ of error to this court, the judgment rendered on that verdict was reversed. According to the record then before us, the company's railroad yard extended from the Union Depot to the shops, and included the two points between which the deceased was being transported when he was killed. The company's general yard master acted as conductor of the train that carried him, which consisted of a switch engine and a passenger car that belonged to the company, and the injury was inflicted in its yard. The engine was operated by one of its engineers, who was paid by it extra hours for running this train on the evening of the accident, and by one of its firemen, under the orders of this yard master. On the evening of the accident, this engineer, by direction of the yard master, went to the shops of the company, and, with the switch engine, drew the passenger coach, filled with employés of the company, from the shops to the Union Depot, where they held a meeting. The deceased rode from a point near the shops to the depot in this coach. After the meeting, and at about 10 o'clock in the evening, this coach stood opposite the platform at the depot, on the outgoing west-bound track of the company, in front of the engine. The yard master invited the employés to board the coach, and the deceased and others did so. This yard master then directed the engineer to push the coach towards the shops. He did so, and on the way pushed it against some freight cars that were on the track, and Davidson was killed in the collision. There was no evidence that any one paid any fare. The duties of the yard master appeared from that record to be to instruct the switchmen what to do, to receive orders from the shipping agents, and to tell the foremen of the crews what to do. There was no evidence that the yard master was not, at the time of the accident, in the discharge of his duties, as the employé of the company, in operating this train, and none that he was not authorized to transport passengers for it. On this state of facts, we held that the presumption was that one riding in a passenger coach or omnibus, or any other carriage of a common carrier that was palpably designed for the transportation of passengers, was lawfully there by invitation or permission of the employés of the carrier in charge of the vehicle, and that these employés had authority to bind the carrier by such invitation; that these presumptions were not conclusive, and might be rebutted by proper evidence or countervailing circumstances; but that, in the absence of such evidence or circumstances, there was some testimony in that record proper for the jury to consider, on the issue of whether the deceased was a passenger of this company or not. Bryant v. Railway Co., 53 Fed. 997, 4 C. C. A. 146.

The case now presented differs radically from that to which we have referred. In the record now before us the following facts are established without dispute: The point near the shops between which and the Union Depot this train moved on the night of the accident was not within the limits of the company's yard, but was about three-fourths of a mile west of its westerly limit, and was connected with it by but a single track. The company operated no passenger cars or trains between these points, and never had operated any, except that, by special order of the superintendent or train dispatcher, an excursion train, with a regular conductor, engineer, and brakeman, was once or twice operated from the shops to Hudson, Wis., five or six years before this accident, to carry the employés to a picnic. The yard through which this train passed was a freight yard, was used to switch freight cars and to make up freight trains, and the yard master who ran this train had nothing to do with making up, switching, or running passenger cars or trains, unless directed to do so in a specific case by a special order of his proper superior, save that, when such trains came through his yard, it was his duty to see that they had a clear track, and to direct engineers who were not familiar with the yard on what tracks they should run their engines; and, save that he occasionally switched an extra passenger coach in the yard, this yard master never had any authority to receive or carry passengers for this company, except in one instance, when, by special order of his superiors, he was directed to take the superintendent of the company, on an engine, to Shakopee, a distance of about 25 miles, and except that occasionally, by the special orders of his superiors, he acted as conductor of a regular passenger train between St. Paul and Merriam Junction, a distance of about 40 miles, when the regular conductors were for some reason unable to act. With these exceptions, he had never carried any passengers for this company before the night of the accident. He was the "day yard master" in this freight yard. He had no duties to discharge for this company after 6 p. m. At that time he went off duty, and from that time until the next morning the yard was in charge of, and the duties of the yard master were discharged by, another, who was termed the "night yard master." These duties were so discharged by the night yard master on the night of this accident. Nevertheless, this day yard master operated this train between 7 and 11 o'clock at night, for the purpose of enabling himself and his fellow servants to ride free to a meeting of their own. He had no authority to run passenger trains or coaches over this railroad from the company or any of its officers, and none of the officers of the company that had the right to permit such trains to run between the depot and these shops knew that he intended to operate this train until after the accident occurred.

It is not only difficult to discover in this record any evidence to warrant the finding of the jury that the relation of passenger to carrier existed between the deceased, who rode on this wild train, on the invitation of this yard master, and the company, but the defense of the company that the train he occupied was not operated by the company, but by the yard master, without authority from or

notice to it, seems to be conclusively established by this uncontradicted testimony. That a yard master generally has no authority to accept, receive, or carry passengers for his company, or to run any passenger trains on its railroad, is proved without contradiction. That this particular yard master never had and never exercised or attempted to exercise any such general authority before this accident, is established by the testimony of the general officers of this company, and is nowhere contradicted. This testimony is confirmed, and the rule it establishes is proved by the instances in which the record shows that he had to do with passenger trains. They are (1) that when a passenger train arrived at this yard, whose engineer was not familiar with it, he was required to board the engine, and point out to him the tracks on which he should run his train through the yards; (2) that four or five years before the accident, in two instances, when passenger trains, with full crews, were ordered by his proper superiors to take the employés from the shops, through this yard, to picnics, he directed the engineers of the trains on what tracks to run them from the shops through this yard; (3) that in 1887, under a special order of his superior, he took the superintendent of the road to Shakopee, a distance of about 25 miles, with a switch engine; and (4) that, by special orders of his superior, he acted as conductor of a regular passenger train between St. Paul and Merriam Junction three or four times when the regular conductors were either sick, or in some way unable to act. That this yard master should have been in charge of this yard for years, and in all this time had no more to do with the passenger business of this company than is here disclosed, is very conclusive evidence that he was without authority to interfere with it. Indeed, as soon as the station and general authority of a yard master of a freight yard are proved, it becomes almost common knowledge that such an employé has no authority to operate passenger trains over the railroad of his company. That power must necessarily be, and generally is, delegated to a single officer, called the "train dispatcher," whose duty it is to know the time and place of each train, and to keep the tracks clear before them. The evidence is that this power was so delegated by this company. The case in hand is a terrible illustration of the confusion and disaster that must necessarily result when another, without the knowledge of this officer, attempts to usurp his authority.

The vital issue in this case was whether or not the deceased was a passenger of this company. The relation of a common carrier to its passenger is a contract relation. Whether or not such a relation existed between the company and the deceased depends primarily upon the question, whether this yard master must be held to have been the agent of the company when he was operating this fatal train, for the company made no contract to carry the deceased, unless it made it through this man. That this yard master had no actual authority to operate this train or make this contract is not denied, but counsel for the defendant in error, in support of their view, invoke the rule that as against third persons the principal is bound by the acts of the agent done in the course of his employment, not

only when these acts are within the scope of his actual, but when they are within the scope of his apparent, authority. This rule, in our opinion, has no application to this case, for two reasons: First, the company never invested this yard master with any apparent authority to carry passengers on or to run this passenger train for it; and, second, he did not run this train in the course of his employment for the company, but for his own ends, when he was not engaged in serving his company. There is no doubt that a principal who holds his agent out to the world as the possessor of certain authority may be bound by the latter's acts within the scope of that authority, although he has secretly restricted it to narrower limits. The reason for the rule that the principal is bound by the acts of the agent within the scope of his apparent authority is that it is inequitable for a principal to induce strangers to enter into contracts with one that he gives the appearance of his agent, and to change their actions and relations on the faith of such agency, and then to deny that the agency was what he made it appear to be. The rule rests upon the principle of estoppel. It follows that the principal is bound only to the extent of the appearance he gives, or knowingly permits the agent to give, or might reasonably expect the agent to give, to the agency, and not by any appearance of agency beyond this that the agent himself wrongfully produces without the knowledge or consent of his principal. It is only acts within the scope of the apparent authority with which the principal clothes the agent, not those within the scope of the apparent authority with which the agent wrongfully clothes himself, without the assent or knowledge of his principal, that are binding upon the latter. Undoubtedly, the principal in conferring the authority upon his agent must be held to the rule of reasonable foresight, prudence, and care, and may be bound by such acts of the agent as a reasonably prudent man would expect that his agent might appear to have the right to do, from the authority actually given. Tested by this rule, this yard master never had any apparent authority to carry passengers for this company on a wild train in the night, or in any other way, over any part of this railroad, without orders from or notice to the train dispatcher or some other superior who had the authority to permit and provide for it. The possession and control of the passenger coach gave him the only appearance of authority to carry passengers that he had, and that coach he took, according to this record, without notice to and without the knowledge of any of the employés of the company who had the authority to permit it to run upon this road. Whatever appearance of authority the possession of this coach conferred upon him, then, was not bestowed upon him by the company, but was produced by his own act, without its knowledge or assent. Nor was there any act or permission of this company that any reasonably prudent man could have foreseen would be likely to confer any apparent authority upon this agent to carry passengers for this company. The general authority of a freight yard master did not confer it. The specific authority of this yard master did not bestow it. The course of business and custom of years had never produced a single instance of its exercise by this employé without a special

order from a superior officer who had the proper authority to direct it. How could this company judge of the future but by the past? And who could have anticipated that a servant who had never had any authority to carry passengers, and who in a service of years had never carried one without a special order to do so from his proper superior, would seize a passenger coach and a switch engine, and run them, loaded with his fellow servants, over the busiest and most dangerous part of this railroad, in the night, without notice to train dispatcher, superintendent, or general manager, or any other officer that had authority to permit the passage of such a train or to clear the way for it? In our opinion, no one could have anticipated an act so foolhardy and unusual, and this was not an act within the scope of the apparent authority with which this company clothed this agent.

Moreover, it is a fatal objection to the liability of this company for the acts of this yard master in operating this train that they were not done in the course of his employment for the company, but for his own ends exclusively, while he was at liberty from his master's service. The master is not liable for an act done by a servant when he is free from his service, and is not attempting to discharge any duty to his master imposed upon him by his employment, but is pursuing his own ends exclusively, even though the act could not have been done without the facilities afforded by his relation to his master.

In Mitchell v. Crassweller, 13 C. B. 237, a carman, whose duty it was to put the horse and cart of his master in his stable after the day's work was completed, obtained the keys of the stable for that purpose, and then drove in another direction on his own business, without the consent of his master. On his return he drove his master's horse and cart against and injured a third person, but the master was held to be exempt from liability for this injury.

In Cousins v. Railroad Co., 66 Mo. 572, the superintendent of the company took an idle locomotive from its roundhouse in the night, and ran it 2½ miles for a doctor for a sick neighbor. On the way he carelessly drove the engine upon and killed the plaintiff's mule. But the supreme court of Missouri held that the company was not liable for the death of the mule.

In Morier v. Railway Co., 31 Minn. 351–353, 17 N. W. 952, a case in which an action was brought against the company for damages that resulted from a fire kindled by its sectionmen on its right of way to cook their dinners on a day when they were working for the company before and after their dinner, Judge Mitchell, of the supreme court of the state of Minnesota, states this rule in these words:

"If the act be done while the servant is at liberty from the service, and pursuing his own ends exclusively, the master is not responsible. If the servant was, at the time when the injury was inflicted, acting for himself, and as his own master, pro tempore, the master is not liable. If the servant step aside from his master's business, for however short a time, to do an act not connected with such business, the relation of master and servant is for the time suspended. Such, variously expressed, is the uniform doctrine laid down by all authorities. 2 Thomp. Neg. 885, 886; Shear. & R. Neg. §§ 62, 63; Cooley, Torts, 533 et seq.; Railroad Co. v. Wetmore, 19 Ohio St. 110; Storey v.

Ashton, L. R. 4 Q. B. 476; Mitchell v. Crassweller, 13 C. B. 237; McClenaghan v. Brock, 5 Rich. Law, 17."

To the same effect are Campbell v. City of Providence, 9 R. I. 262, and Garretzen v. Duenckel, 50 Mo. 104, 107, 111.

This record brings this case directly under this rule. The yard master who ran this train ceased the performance of his duties to the company at 6 p. m. on the day of the accident, and was then succeeded in the discharge of those duties by the night yard master. From that hour until the next morning he was free from his service for this company. While he was thus at liberty, and without notice to, and without the knowledge of, his superiors in the service of the company, he operated this train, not to earn fares for the company, for none were charged or collected, but to furnish himself and his fellow servants a free ride to and from the depot where they held a meeting of their own. These undisputed facts exempt this company from all liability for any of the acts done or contracts made in the course of the operation of this train. They were not the acts or contracts of the company. They were the acts and contracts of the individual who performed and made them, and his only, and he alone can be held for the injury they caused. Nor can the company be charged with these acts on the ground that it has ratified and adopted them because it paid the engineer or the fireman for three hours extra time for running this train. This payment is disputed, and the evidence regarding it is conflicting; but we assume, as we must for the purposes of this case, that the payment was made. The testimony is, however, undisputed that, if this payment was ever made, it was allowed by direction of the master mechanic at the shops, an employé who never had any authority to direct or permit the operation of passenger trains or coaches, or to make, adopt, or ratify contracts to carry passengers. His action allowing or disallowing a claim of an employé for payment for extra hours' service could not make the company a party to the contracts of a third person that he had no authority to make on its behalf.

Finally, it is said that inasmuch as the presumption that the deceased was a passenger of the company arose from the facts that the yard master was in possession of the train, operating it on the track of the company, and the deceased was riding therein, there was some evidence for the jury in support of the claim of the defendant in error, and the case was properly submitted to them by the court. But this argument loses sight of the fact that it is only when there is a dispute regarding material facts or a reasonable doubt as to the inference that must be drawn from undisputed facts that the court is required to submit an issue to the jury. All the material facts in this case are proved without contradiction or dispute. The inference that must be drawn from them under the law is not doubtful. A presumption of fact, like that which the counsel for the defendant in error here invoke, is a mere inference from certain evidence, and, as the evidence changes, the presumption necessarily varies. A trial court is not bound to disregard a conclusive presumption which arises from all the evidence at the close of a case because at some time in the course of a trial counter presumptions

arose. Possession of real estate raises a presumption of title; but, when a legal title is proved in another, a conclusive presumption arises from all the evidence that the latter is the owner, and the court must so direct. Possession of a horse raises the presumption of ownership, but the uncontradicted evidence of competent witnesses that the horse is the property of another, and that the possessor secretly took him from his owner without right raises so conclusive a presumption of ownership in the latter that the court might be bound to disregard the first presumption from possession, and the possession itself might raise a presumption of larceny. So in the case at bar, when the uncontradicted evidence established the facts that the yard master in charge of this train had no authority to carry passengers or to operate passenger trains for this company when he was on duty; that the train on which the deceased was injured was operated by him when he was at liberty from the service of the company, not in the discharge of any duty to it, but for the convenience of himself and his fellow-servants, without the knowledge of and without notice to those officers of the company who alone had the right to permit this train to be moved on the railroad at all, and that he obtained the passenger coach himself without the knowledge of any of these officers,—the conclusive presumption arose from all this evidence that his acts and contracts in this regard were not binding upon the company, and that those who rode upon that train were neither its passengers nor its licensees. Daly v. Railway Co., 43 Minn. 319, 45 N. W. 611; Karsen v. Railway Co., 29 Minn. 12, 11 N. W. 122.

The court below should have instructed the jury to return a verdict for the company, and the judgment below must be reversed, and the case remanded, with directions to grant a new trial. It is so ordered.