### RUSSELL v. OREGON SHORT LINE R. CO.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1907.)

No. 1,385.

**1. TRIAL—DIRECTION OF VERDICT—QUESTIONS OF NEGLIGENCE.**

While questions of negligence are ordinarily for the jury in federal courts, a case may be withdrawn from the jury and a verdict directed for plaintiff or defendant, as may be proper, where there is no conflict in the evidence, or where it is so conclusive in its character that the court, in the exercise of its sound judicial discretion, would be obliged to set aside a verdict rendered in opposition to such evidence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 376–395; vol. 37, Negligence, §§ 277–286.]

**2. MASTER AND SERVANT—TEMPORARY SUSPENSION OF RELATION—DEPARTURE BY SERVANT FROM SERVICE OF MASTER.**

Plaintiff's intestate, who was a bridge foreman on defendant's railroad, living at the time in an outfit car on a siding, went with his family on a velocipede car one afternoon to a spur track some 2½ miles distant, near which his father-in-law resided. The car was returned, and in the evening about 7 o'clock some of the men by his direction came after him with a hand car. He was then at his father-in-law's house, where he had been visiting since 5 o'clock, by which time his business for the defendant at the spur, if any, had been finished. About 8:30 he started back with the men, having no light on the car, and while on the way was killed in a collision with a meeting special train. *Held*, that at the time he was engaged on his own private affairs, and no relation of master and servant existed between him and defendant which brought him within the terms of a state statute making railroad companies liable for injuries to their employés caused by negligence of their fellow servants.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 144–156.

Injuries to servant while not on duty, see notes to Ellsworth v. Metheney, 44 C. C. A. 489.]

**3. RAILROADS—INJURY TO PERSON ON TRACK—CONTRIBUTORY NEGLIGENCE.**

A bridge foreman on a railroad, familiar with the operation of trains thereon, and knowing that special trains were liable to run at any time, who, while not in the performance of any duty for the company, but in the pursuit of his own affairs, went upon the track at night on a hand car showing no light and was killed in a collision with a special train at a distance from any crossing, was guilty of contributory negligence, and there can be no recovery from the company for his death, even conceding that the train was negligently operated, where such negligence was not willful

nor wanton, and the presence of the hand car approaching on the track was not known to the engineer until the collision occurred.

In Error to the Circuit Court of the United States for the District of Idaho.

Will R. King, for plaintiff in error.

F. S. Dietrich, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

HUNT, District Judge. The plaintiff, Frances B. Russell, as administratrix of the estate of P. J. Russell, deceased, brought this action against the Oregon Short Line Railroad Company, defendant, to recover a judgment for damages for the death of her husband, which occurred on the evening of December 3, 1903. Defendant denied negligence, set up contributory negligence, and that deceased was engaged on his own private business when he was killed. The evidence showed substantially these facts: The deceased, P. J. Russell, was and had been for seven years a bridge foreman of the defendant railroad company. About the time of his death, the bridge gang of which he was foreman was engaged in work upon a bridge that was about two miles or more east of the town of Ontario, a place of 1,100 or 1,200 people. The bridge gang lived in what are called "outfit cars," which were moved from place to place as convenience required. These cars were kept on a side track at the stockyards, half a mile east of the town of Ontario, The deceased and his family lived in one of the outfit cars. Russell had been working in that vicinity about a month. Two miles west of Ontario, at a place spoken of as "Washoe Siding," there was a spur. On the afternoon of December 3, 1903, the deceased did not go to work where the bridge gang was employed; but at noon of that day, at the outfit cars, he told one of the men that he was going to Washoe, and requested him (Stroup by name) to come over after him after the work of the day was finished. The custom of the bridge gang was to stop work at 6 o'clock, and then to eat supper. Prior to the date of the accident Russell had tendered his resignation to the defendant company, but was not to leave the service of the road for a few days. Russell had bought a ranch near the Washoe Spur, and his intention was to give up railroading, and to live upon his farm. Mrs. Russell's father and family also lived at Washoe next to Mr. Russell's place, about a quarter of a mile from the spur. About 3 o'clock on the afternoon of December 3d, the deceased took his wife and children on a railroad velocipede from the outfit cars to the Washoe Spur. Upon their arrival at the spur, the velocipede was left near the track, but was afterwards taken back by a railroad employé who had been at Russell's place that day. After leaving the spur, the Russells went over to the place owned by the deceased, and stayed there about half an hour. Mr. and Mrs. Russell were getting ready to move in a few days to the ranch. They spent the afternoon, principally, at Mrs. Russell's father's house. Mrs. Russell testified that while they were on the way to Washoe, or just before they started, her husband told her that he was going down there "to see about getting men to work, and to see about

the spur that was there, and to see if there was room to set cars in." She said, too, that her husband was outside of her father's house part of the afternoon, and that he had told her he was going to see about employing a man named Burgess. The Burgess people lived on the same side of the track that her father did, near the track, between her father's house and the town of Ontario, about a quarter of a mile nearer to town than her father's place. It would have taken her husband about 10 minutes to walk from her father's place over to the Burgess house. Russell took supper with his father-in-law and family about 5 o'clock, and remained with the family from supper time until he left. Mrs. Russell says that she intended to return with Mr. Russell, but her children went to sleep, and she did not go back, and that they remained so long after supper "simply visiting" and "in social intercourse" with her people. At about 7 o'clock three men from the bridge gang voluntarily went down to Washoe upon an ordinary hand car for the purpose of getting Mr. Russell. They reached Mrs. Russell's father's house about 7:30. They did not start back until about an hour or an hour and one-half after they reached Mrs. Russell's father's place, so that it was about half past 8 when Russell and the three men started eastward toward Ontario, where the outfit cars were. At a point approximately 3,800 feet west from the Ontario depot, an engine, drawing the general manager's special train of three passenger cars, came upon the hand car and the men. The speed of the hand car at the time was between five and eight miles an hour; it was making considerable noise. Russell was helping to pump the car. The speed of the special train is estimated by different witnesses for plaintiff at between 40 and 70 miles an hour. Some of the men on the hand car say they were looking ahead, but did not observe the special train until it was from 200 to 400 yards away, but could see the lights of the town of Ontario before they saw the train. There was no light of any kind on the hand car. There was then no headlight shining on the engine. Russell first called, "Stop! there is a train." The men stopped the hand car as quickly as possible, and endeavored to remove it from the track before the engine reached them. They lifted only one end of the hand car off the rail when the engine struck the other end, and threw Russell, who was trying to lift the hand car off, so injuring him that he died immediately. No one else was struck or hurt. The railroad track about this point was nearly straight for a distance of about two miles. The train had passed through the town of Ontario without a headlight, and without stopping, but it had whistled about a mile east of the town, and one of the men on the hand car says he heard a whistle just before the accident. Upon this point the witnesses do not wholly agree. The headlight on the engine was burning at Arcadia, the station east of Ontario six or seven miles, and the evidence tended to show that it was burning dimly at the first stopping place west of Ontario, three miles distant. It appeared that at that time the railroad company was gradually equipping its engines with electric headlights, and that the men found more or less difficulty in keeping the headlights burning constantly. Upon the night in question the fireman went out on the engine to fix the headlight, which had gone out, about the time the train approached the bridge east of Ontario. If it had been burning properly when the train

approached Ontario, it could have been seen two miles away. There is a serious conflict in the testimony as to whether the engine had its "blizzard lights," which are oil lights on the front end of the engine, burning that night when the train went through Ontario. Plaintiff's witnesses say they did not see them; defendant's witnesses say they were burning and in good order, and could have been seen. The rules of the company forbade the use of hand cars, except in the line of duty. Hand cars at night were also required to display red lights to the rear. It appeared from plaintiff's evidence that it was the duty of men engaged in the bridge gang, and they were instructed, to be on guard all the time for extra trains, and that this was particularly true of men engaged in work upon bridges, as it was necessary for them to obstruct the track at various places in driving piles and otherwise repairing or constructing bridges. Russell's superior testified for defendant that it was not in the line of the bridge foreman's duty to observe spurs with a view to setting cars in, and that Russell had no business on behalf of the company at any place, except where the bridge gang was at work, but that he had authority to employ and discharge men. At the conclusion of the evidence introduced by both sides, the court granted the defendant's motion to direct a verdict, based upon the grounds, among others, that the deceased was guilty of contributory negligence, and that when he was killed he was a trespasser upon the railroad tracks. Judgment was entered for the defendant, and appeal was duly perfected.

The principal assignment of error by the plaintiff is that the Circuit Court erred in not submitting the question of negligence to the jury. Counsel devotes a considerable part of his brief and argument to the contention that the case presented a question of fact for the jury to determine, from all the circumstances, whether or not the defendant company had provided suitable appliances for its train upon the night of the accident, and whether proper caution was used in running its special train through Ontario without a headlight, whether or not "marker" lights were on the engine, and• whether defendant was or was not negligent in not having oil lamps at Ontario, so that, in case the electric lights went out, an oil lamp could be substituted. It is unnecessary to discuss the rule dwelt upon by counsel that ordinarily questions of negligence are for consideration by the jury, guided by proper instructions by the court as to the principles of law by which the jury should be controlled. That rule is so firmly established that it may be regarded as elementary. But it is also thoroughly well settled that a case may be withdrawn from the jury altogether and a verdict directed for plaintiff or defendant, as may be proper, where there is no dispute in the evidence, or where it is so conclusive in its character that the court, in the exercise of its sound judicial discretion, would be obliged to set aside a verdict rendered in opposition to such evidence. Delaware, etc., Railroad v. Converse, 139 U. S. 472, 11 Sup. Ct. 569, 35 L. Ed. 213. In Schofield v. Chicago & St. Paul Railway Company, 114 U. S. 615, 5 Sup. Ct. 1125, 29 L. Ed. 224, Justice Blatchford, pronouncing the unanimous opinion of the Supreme Court, said:

"It is the settled law of this court that, when the evidence given at the trial, with all the inferences which the jury could justifiably draw from it,

is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant. Improvement Co. v. Munson, 14 Wall. 442, 20 L. Ed. 867; Pleasants v. Fant, 22 Wall. 116, 22 L. Ed. 780; Herbert v. Butler, 97 U. S. 319, 24 L. Ed. 958; Bowditch v. Boston, 101 U. S. 16, 25 L. Ed. 980; Griggs v. Houston, 104 U. S. 553, 26 L. Ed. 840; Randall v. Baltimore & Ohio Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322, 27 L. Ed. 1003; Anderson County Com'rs v. Beal, 113 U. S. 227, 5 Sup. Ct. 433, 28 L. Ed. 966; Baylis v. Travellers' Insurance Co., 113 U. S. 316, 5 Sup. Ct. 494, 28 L. Ed. 989."

Inasmuch, therefore, as the federal courts had authority, when this action was tried, to direct verdicts under certain conditions in negligence suits, we must inquire whether, in the present case, error was committed by the lower court in holding that, as a matter of law under the evidence, Russell was guilty of contributory negligence which barred recovery, whatever negligence there may have been on the part of the railroad company. There was substantial evidence of negligence on the part of defendant's engineer in running the train at a very high rate of speed through Ontario without a headlight. The engineer must have known his light was dim or out altogether, and he ought to have slowed down or stopped at Ontario and taken new lights, or repaired the one he had. It is highly probable that, if there had been a headlight shining before the train reached Ontario, some of the men on the hand car would have seen it, and the hand car could have been removed in time to have saved Russell's life. But the failure of the engineer to fix his headlight, or to slow down, or to get other lights at Ontario, did not impose liability upon the defendant for killing the deceased, unless plaintiff has shown that when deceased was struck he was acting in the line of his duty as a servant of the company, and that by reason of such relationship and action he was rightfully upon the track, and that, therefore, the defendant owed a duty to him of having a headlight burning, and of running its train at a slower rate of speed, and of having blizzard lights burning upon the engine. The most favorable view of the case from plaintiff's standpoint is that Russell took the velocipede car in the afternoon for two purposes—one, to see about setting cars in on the spur at Washoe; the other, to see about employing Burgess for the company. These were the only reasons given for the trip to Washoe. He reached the spur about half past three in the afternoon. Now, clearly, only a most casual observation was necessary to enable the deceased to see whether there were any cars already upon the spur, and whether the track was in condition to receive cars; if he wished to have any put there for convenience in connection with his bridge repair work. No assistance was needed to make this inspection; so no delays were required. Upon this branch of the case, therefore, we have no doubt at all that the only inference that can be drawn from the evidence is that Russell made such examination of the spur as he believed was necessary before half past 3, when he went with his family to his father-in-law's house. Passing, then, to the proposed employment of men, we find that Russell may have seen the man Burgess and talked with him about work. There is no evidence at all that he did go to Burgess' house, or did see him, except Mrs. Russell's statement of the inten-

tions of her husband, as he told them to her before they reached Washoe. Burgess was not called and did not testify; nor was his absence from the trial explained in any way. But, conceding that Russell did go to see Burgess, and did see him about employment, it yet appears that Russell must have seen him in the afternoon before 5 o'clock, because Mrs. Russell positively testified that her husband ate supper with her at her father's at 5 o'clock, and that he remained with the family from that time until he left for the outfit cars—about eight o'clock or after in the night. So, from 5 to 8, or thereabouts, he was doing nothing for the railroad company, and was engaged purely in pursuit of his own affairs. Had Russell gone back to the outfit cars in the afternoon with the velocipede, as he could have, the accident would not have happened; but he preferred to stay for his own pleasure, and wait for the men who were coming down with the hand car after supper. It is undisputed that the men in the hand car reached the house of Mrs. Russell's family about 7 or shortly thereafter. Supper was over, and, as Russell's duties for the company had ended before 5 o'clock, there was nothing to prevent his immediate return with the men, and had he gone at once with them the accident could not have happened. Again he delayed his departure, and remained at Washoe for an hour or more visiting with his wife's family. When he finally started, he went without a light on the hand car. Under this evidence, the conclusion is certain that his act in remaining until 8:30 o'clock was his own, and that, in returning when and in the manner he did on the hand car, he was acting for himself. His conduct was no part, whatever, of any business relation of master and servant. It must be held, therefore, as a matter of law, that his attitude became that of a servant who voluntarily stepped wholly aside from the business of the master to do his own pleasure exclusively. Under such conditions, the master is not liable for the servant's death.

In St. Louis Southwestern Ry. Co. v. Harvey, 144 Fed. 806, 75 C. C. A. 536, the Court of Appeals of the Eighth Circuit said:

" * * * For if a servant step aside from the business of his master for never so short a time to do any act that is not a part of that business, the relation of master and servant is for the time suspended, and the acts of the servant during that interval are not his master's but his own. Benson v. Chicago, St. P., M. & O. Ry. Co., 78 Minn. 303, 307, 308, 80 N. W. 1050; Baker v. Kinsey, 38 Cal. 631, 633, 99 Am. Dec. 438; Georgia Railroad Co. v. Wood, 94 Ga. 126, 21 S. E. 288, 47 Am. St. Rep. 146.

"Nor does the fact that servants guilty of a tortious act make use of the master's cars, engines, or other facilities, which they could not have obtained in the absence of the relation of master and servant, to commit it, while pursuing their own ends exclusively, charge the master with liability for their act, in the absence of his knowledge or consent to such use. Chicago, St. P., M. O. Ry. Co. v. Bryant, 65 Fed. 969, 973-975, 13 C. C. A. 249, 253-255."

The court cites numerous decisions to sustain the rule which controlled. Cousins v. Railway Co., 66 Mo. 572; Morier v. Railway Co., 31 Minn. 351, 17 N. W. 952, 47 Am. Rep. 793; Campbell v. City of Providence, 9 R. I. 262; Garretzen v. Duenckel, 50 Mo. 104, 11 Am. Rep. 405; Chicago Consol. Bottling Co. v. McGinnis, 86 Ill. App. 38; Snyder v. Railway Co., 60 Mo. 413. To this list may be added Shadoans, Adm'r, v. C. N. O. & T. P. R. Co., 82 S. W. 567, 26 Ky.

Law Rep. 828, where it was held that where a brakeman on a freight train went into the cab of the locomotive of another train to get a drink of water, and, while there for that purpose, the two trains collided and he was killed, there could be no recovery, though the collision was due to the negligence of the railroad's servants, deceased not being in the discharge of any duty to the master.

Again, as deceased was not doing duty for the company, but was pursuing his own affairs only at the time of his death, he was not in that relationship of fellow service with the engineer or operatives of the special train which enables his administratrix to recover, relying upon the fellow servant statute of the state of Oregon, approved February 10, 1903, entitled "An act imposing upon railroad corporations liability for injury to their employees in certain cases." In Railroad Co. v. Wade, 35 South. 863, 46 Fla. 197, a wife sued for damages for the death of her husband. The deceased was killed near the eastern boundary of a village in a collision between a hand car and a locomotive. In that case the facts showed that the engine was being run backwards in the night, and it was contended that it did not have proper lights and was running at an unusual rate of speed. The deceased was employed as a member of a bridge gang, but had been discharged for the day, and had borrowed the hand car he was upon from the foreman of the crew of which he was a member. But the court held there could be no recovery, basing its decision upon the ground that the deceased at the time of the accident was not on duty, and was not a fellow servant with the trainmen, and that no relationship of master and servant existed.

In conformity with the views expressed, our opinion is that the relationship of master and servant, and that of fellow servants, and the legal principles applicable thereto, are without the case, and that consequently the action resolves itself into the ordinary one where a plaintiff seeks to recover damages for the death of a person, resulting from the fault or negligence of another. Judged from this standpoint, under firmly established principles, the plaintiff must fail, for the reason that the undisputed evidence permits of no deduction other than that deceased was guilty of fault which directly contributed to the accident which resulted in his death. A railroad company must necessarily have an exclusive right to use its tracks (subject to certain legal rights of the public at crossings), and cannot ordinarily be held responsible for a failure of its engineers to anticipate that at night, between stations and away from crossings, there are persons using hand cars upon the rails without signals of any kind. Conceding that the company in this case was negligent in some respects, as heretofore stated, nevertheless its train was lawfully upon its tracks when deceased was killed; while the deceased was negligent in using the tracks at all by going voluntarily upon them in the night, for his own business, with a hand car, and without a light. His situation was one of great peril, which carried with it all risk of safety. He ought to have used the utmost vigilance to protect himself against possible approaching trains. He was familiar with railroads, and, as a bridge foreman, knew that a special train might come very unexpectedly. Northern Pacific Railway Co. v. Jones, 144 Fed. 47, 75 C. C. A. 205.

Appellant makes the point that even if deceased was guilty of negligence, still that such negligence should not prevent recovery if it was shown that the defendant company might, by the exercise of reasonable care and prudence, have avoided the consequences of the negligence of the deceased. Inland Seaboard Coasting Company v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270, and Grand Trunk Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485, are cited to sustain this argument. The facts of the present case, however, render these citations inapplicable, for it was thoroughly well established on the trial that the defendant's servants in charge of the special train not only could not have anticipated that the deceased was upon the track at the point where he was killed, and in a dangerous position, but that they could not by any possible exertion have avoided the injury to the deceased after his danger was discovered. There is no question of wanton or willful negligence involved. Indeed, the engineer knew nothing at all of any danger until the collision occurred. In Northern Pacific Railway Co. v. Jones, supra, speaking through Judge Gilbert, it was pointed out that the doctrine laid down in Inland & Seaboard Coasting Company v. Tolson was applicable where the agents of the defendant knew of the presence of the injured person, and where there appeared to be reason to believe that such person was not able to avoid injury or danger; but it was distinctly held that neither of the cases just cited "intended to lay down the broad rule that no contributory negligence of the party injured will defeat his right to recover if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of that negligence." Nor are cases involving the duty of a railroad company at a public road crossing pertinent, as the collision where deceased was killed occurred a considerable distance west of any road or crossing.

Our conclusion upon the whole case is that the court was right in directing a verdict, and that judgment must be affirmed.