## CENTRAL OF GEORGIA RAILWAY CO. *v.* McWHORTER.

1. Under the rules of the railroad company which were involved in the present case, no duty was imposed upon the conductor to examine or repair the brake or any appliance connected with the operation of the same, such duty resting, under the rules, upon the subordinates of the conductor, and the duties of the conductor being simply those of supervision and direction.

2. It follows from the foregoing that when the plaintiff went between the engine and the cars for the purpose of examining the air-hose used in operating the air-brake (the same being in a defective condition), there being no pressing emergency requiring him to perform this duty, which the rules imposed upon his subordinates, he was guilty of such fault as will preclude him from recovering damages for injuries sustained as a direct result of his having unnecessarily abandoned his position as conductor for the purpose of performing duties which, under the rules of the company, should have been performed by his subordinate.

3. When a railway conductor, in the absence of any emergency or of circumstances so requiring, goes outside of the line of his duties as prescribed by the rules of the company, and thus places himself in a position of danger, and is injured by the moving of a train, he is guilty of negligence, and can not hold the company liable, even though the engineer causes such movement to be made without ringing the bell of the locomotive, and in so doing violates a rule of the company ; and more especially is this true when the conductor, by reason of past experience, must be aware that the engineer, in the absence of any knowledge that the conductor is so exposing himself to danger, can, as to him, safely omit the ringing of the bell, and yet fails to inform the engineer of the intended risk which will render such omission hazardous to the conductor.

Submitted March 1, — Decided April 26, 1902.

Rehearing denied June 10, 1902.

Action for damages. Before Judge Candler. Clayton superior court. January 22, 1901.

*Hall & Boynton, W. L. Watterson, W. C. Beeks, R. L. Berner,* and *Lloyd Cleveland,* for plaintiff in error.
*Hoke Smith & H. C. Peeples,* contra.

Cobb, J. The plaintiff sued the railway company for damages. At the trial it appeared that the plaintiff was the conductor of an accommodation-train which ran between Atlanta and Jonesboro. It had reached Jonesboro, and he was making up the train to put it in place and have it ready to start to Atlanta the next morning. His entire crew on the train consisted of an engineer, a fireman, and a train-hand. The engine had been disconnected from the other cars and was brought back and coupled to them. After the coup-

ling was made and the air-hose attached, the plaintiff noticed a serious leak, or some other defect, in the air-hose. He stepped in between the engine and the car to find out what the defect was. The engineer started the train, throwing the plaintiff down and cutting off his arm. The plaintiff's description of the manner in which he was injured was as follows: "When the engine backed and made a coupling, I was standing on the end of the passenger-car on the right-hand side looking towards Atlanta. The engineer is on the right-hand side. The engine was headed for Atlanta. Immediately after this coupling was made, and as soon as I threw the pressure in by turning the angle-cock on, the engine threw the air pressure back on the train. The air escaped, or a good portion of it, at about the coupling of the air-hose. I could not from the outside determine what the character of that leak was. When I discovered that the air-hose was leaking, I went to examine it, and to see what was the matter with it; and in making the examination there was no way to examine it except to take exactly the position I did, getting between the car and the engine. When I went in to make the examination the engine was, without notice to me and without any signal from me, started immediately off, just as I was in the act of making that examination, and threw me forward to the ground, and came very near running over me. But I got out with the loss of an arm." The testimony shows that what was done on the occasion that the plaintiff was injured was the course usually pursued when the train of which he was conductor arrived at Jonesboro and preparations were being made to store the train away for the night; that as soon as the brakeman coupled the engine to the cars and informed the engineer that everything was all right, the engineer then "pulled out." It is true that the plaintiff testified that this was the way they did when everything was all right, but there is nothing in the evidence to show that the engineer on this occasion knew that anything was wrong. The plaintiff did not tell him that there was, nor did he inform him that he was going between the engine and the cars.

Did the engineer under these circumstances owe to the conductor the duty of ringing the bell or giving any other signal before starting the train? But suppose that the engineer was negligent in not ringing the bell or giving other signals that the engine was about to move, was not the plaintiff at fault? He knew the customary way

in which the engineer acted on such occasions, viz., that he was liable to start as soon as the brakeman informed him that everything was all right.    Was not the plaintiff, then, grossly negligent in taking the risk of going between the cars without informing the engineer that something was wrong and warning the engineer not to move the train, for the reason that he was about to go between the engine and the cars to investigate the matter?    Let it be conceded, however, that the evidence authorized a finding that the company was negligent for the reason that the engineer moved the train, in violation of a rule of the company, without ringing the bell or giving other signals, or for any other reason, and let it also be conceded that the plaintiff was free from fault in the particular above referred to, was not the injury sustained by the plaintiff the direct result of a departure by him from the rules of the company, and an undertaking by him to perform duties which by the rules were not required of him, and under circumstances where there was no necessity for him to depart from the line of his ordinary duty under the rules?    The plaintiff's injury directly resulted from his going between the car and the engine to examine the air-hose. Was it his duty to place himself in that position for the purpose of examining the apparatus in question when it was out of order?    The answer to this question depends upon the proper construction to be placed upon certain rules of the company.    Rule 72, which was in evidence, provided that passenger conductors "must report for duty at the appointed time with their trainmen and signals, and, when necessary, assist in switching and making up their train."    Rule 74 was as follows: "The air-brakes must be tested by applying and releasing the brakes from the engine before starting from terminal stations, and all other points where engine or cars have been detached or hose couplings separated.    After all couplings have been made, the brakemen must be required to ask the engineer to apply brakes, and will then pass to the rear of the train, noticing that the brakes are properly applied to each car.    The signal cord will be pulled twice from the rear platform, as notice to engineer to release brakes.    The brakeman must then pass to the engine, noticing brakes to ascertain if they all release.    If so, he will report to the engineer that the brakes are working all right.    Should the brakes on any car fail to work, proper steps must be taken immediately to put them in order before starting train."    Rule 89 provided that "The general directions and

government of a train from the time it receives its passengers until it arrives at its destination is vested in the conductor, and all men employed on the train are required to yield willing obedience to his proper orders.   He is responsible for the prompt movement and proper care of his train, and for the equipment entrusted to him." The foregoing rules appear in the rule-book of the company under the head, "Duties of Passenger Conductors."   Under. the head, "Duties of Flagmen and Porters," was rule 91, as follows: "They are charged with the management of the brakes and the proper display and use of the train signals, and must not go between cars under any circumstances for the purpose of coupling or uncoupling, or for adjusting pins, etc., while cars are in motion."

The first rule above quoted, numbered 72, can by its terms apply only at the place where the conductor is required to report for the purpose of taking out a train.   The rule in effect says that the conductors must report at the appointed time to take charge of their trains, and, if necessary, assist in making up the trains, so that they can be taken out.   The rule is framed for the purpose of informing a conductor, who is not on duty, as to what shall be done by him at the time he is required to go on duty, as well as what shall be done by him in seeing and doing what is necessary to place his train in a proper condition to be taken out at the appointed time.   This rule can have no application in a case where a conductor who, having reported for duty at the appointed time, has reached the destination of his train, and is preparing at that point to place it in a position where he and the members of his crew can leave it in safety until it is his duty to take charge of it again and return with it to the place whence he came.   Under this rule, no doubt, the plaintiff had, on the day he was injured, reported for duty in Atlanta to take out his train to Jonesboro, and after that he had no further concern with the rule until the time came for him to report for duty next day, when his train was scheduled to leave Jonesboro on its return trip to Atlanta.   The rule was not operative when the plaintiff was switching his train preparatory to placing it upon the side-track for the night.   There is nothing in the rule numbered 74 which expressly makes it the duty of the conductor to examine or repair an air-hose when it is out of order. Is there anything in this rule from which such a duty can be legitimately inferred?   Is the language of the rule so equivocal that

the rule can be so interpreted as to place this duty on the conductor? We do not think so. The rule numbered 89 places the train under the direction of the conductor, and all employees on the train are required to obey his orders. He is in command. He is to direct others; others are to obey him. While he is, under the rule last referred to, responsible for the prompt movement and proper care of the train and for the equipment entrusted to him, there is nothing in the rule which casts upon him any other duty than that of a supervising superior, so far as the movement of the train or the management of its machinery is concerned. It is no more his duty to adjust or repair the brakes or the air-hose than it is his duty to operate or repair the engine. All these duties are cast upon his subordinates, but they are to be performed subject to his supervision and direction. Construing together the two rules 72 and 89, the former is incapable of a construction which would place upon the conductor the duty of adjusting, handling, or repairing the air-hose. The first portion of rule 74 places the duty upon the conductor of having the air-brake tested at certain points on his route; but the rule distinctly prescribes that the testing shall be done by the brakeman and engineer. The conductor takes no part therein, except to see that it is done according to the rule. If the brakes fail to work, the rule says "proper steps must be taken" immediately to put them in order. Taken by whom? By the conductor, who has so far had nothing whatever to do with the actual handling or manipulation of any part of the machinery of the train? Not at all; but by the subordinates of the conductor, who are charged with these duties, — the brakeman, the flagman, the porter, and, if need be, the engineer and the fireman — all or any who are, under the rules, charged with duties growing out of the actual operation of machinery and the handling of its various parts; but never by the conductor, who, so far as the machinery of the train is concerned, is a supervising superior only. Even if there should be any doubt about the matter, under the terms of rule 74, this doubt is entirely removed when that rule is construed in the light of rule 91, which charges flagmen and porters "with the management of the brakes."

It was argued that the actual management of air-brakes was, from the nature of the machinery, confided to the engineer, and that therefore rule 91 could not apply to trains equipped with air-

brakes.    While it is true that the power that applies or releases
air-brakes is controlled by the engineer, we think the word "man-
agement" in rule 91 was intended to mean more than the mere
application of the power to the brake.    The adjustment and repair
of brakes or the hose is in a sense a part of the management of
the brakes, and this was the duty which devolved upon the flag-
men and porters under the rule.    The evidence authorized a find-
ing that it was the policy of the company that its conductors
should be proficient in the knowledge of air machinery, and to
this end it had, at considerable expense, fitted up a room and em-
ployed an expert to instruct its conductors in the principles and
operation of air machinery, and that the plaintiff had been so in-
structed.    It was argued that the rules of the company should be
interpreted in the light of this fact, and that when so interpreted
the rules would place upon the conductor the duty to repair the
air machinery when it was out of order.    We can not agree with
the learned counsel in this view.    The air machinery of the train
is to be handled, operated, and repaired by the subordinates of the
conductor under his supervision and direction, and he must have a
competent knowledge of the character of this machinery and the
principles by which it is operated and controlled, to enable him to
efficiently discharge the duties of supervision and direction which
the rules place upon him.    A knowledge of the principles control-
ling the operation of air machinery is just as important, if it is not
more essential, to the conductor standing by the side of his train
directing and supervising the work of repair being done by a brake-
man who is between the cars actually handling the machinery, as
it is to the brakeman.    It was also argued that the rules of the
company, if ambiguous or equivocal, should be construed most
favorably to the employee, and that they must not by implication
be given an interpretation beyond their clear and obvious mean-
ing, and that they must be unequivocal and within the compre-
hension of the class of persons upon whom they are designed to
operate.    We recognize all these as general propositions of law
bearing upon the subject of the meaning and force of rules pre-
scribed for the government of employees by railroad companies and
others operating dangerous machinery.    See *Western & Atlantic
R. Co.* v. *Moore*, 94 *Ga.* 457; *Western & Atlantic R. Co.* v. *Bussey*,
95 *Ga.* 584.    When we look at the rules of the company involved

in the present case, in the light of each other and in the light of the testimony in the case, and when we apply to them all the rules of interpretation which are invoked and are applicable, we can reach no other conclusion than that there was nothing in the rules to authorize or require the plaintiff, the conductor in charge of the train at its destination, when he was preparing to store it away for the night, to go in between the engine and the cars for the purpose of an actual examination of the air-hose, in order to discover the defect there, if any existed. Such being the case, the plaintiff was out of his proper place when he was injured, was not free from fault substantially contributing to the injury, and is not entitled to recover in the action brought by him. There was nothing in the evidence authorizing a finding that there was such a pressing emergency upon the plaintiff that he was warranted in leaving his position as a supervising superior in charge of the train and performing the duties of a subordinate who was charged with the actual handling of a portion of the machinery of the train. This case, upon its merits, is controlled by the principle involved in the case of *Whitton* v. *Railroad Co.*, 106 *Ga.* 796, and the cases which were there followed. The court erred in refusing to grant a second new trial in the case. A second verdict in favor of a plaintiff is a reason for refusing a new trial when there has been a fair trial and a right to recover exists; but no number of verdicts in favor of a party can create a cause of action in a case where none exists under the law and the facts.

*Judgment reversed.   All the Justices concurring, except Lewis, J., absent.*

## APPLICATION FOR REHEARING.

No sufficient reason has been shown for granting a rehearing in this case. One ground only of the motion for a rehearing requires any special notice. It is said that a rehearing should be granted because the court overlooked a rule of the company which appears in the brief of evidence. At the conclusion of the brief of evidence we find the following statement: "Mr. Berner offered in evidence rule No. 11 of the special rules, which defendant produced under notice, as follows: 'Conductors will make telegraphic report to trainmaster of all defects in trains handled by them.'" The words quoted formed the last lines of the brief of evidence, immediately preceding the usual entries thereon. That this rule was in evidence

in the case was overlooked by us. It was not considered. The case was decided upon the rules which were referred to in the original opinion. In the very elaborate and able brief of the learned counsel for the defendant in error, which we had before us when the case was decided, and which was carefully examined and earnestly considered, there was not one line that referred to the rule which has been quoted, and nothing in the original brief or in any of the supplemental briefs filed by counsel for the defendant in error had any reference to that rule. It appears from the record, as will be seen, that the rule was not introduced by the plaintiff in the court below, but it was evidence offered in behalf of the railroad company. This would indicate that counsel for the defendant in error did not rely upon this rule in the court below, and the failure to notice this rule in his argument here indicates that he did not rely upon the same as having any material bearing upon the case in this court. In any event, there was nothing to call the attention of this court to the fact that counsel for the defendant in error relied on the rule which was offered in evidence by the plaintiff in error; and counsel can not now be heard, on an application for a rehearing, to present a phase of the case that was either overlooked when the case was argued, or was not considered of sufficient importance at that time to be alluded to in the briefs. A rehearing will never be granted when the application therefor is based upon a ground that the judgment rendered was erroneous for a reason which was not set up or insisted on when the case was submitted, even though such reason might have been, if insisted on at the proper time, sufficient to cause a different judgment to be rendered. In the present instance, however, there is no merit whatever in the application for rehearing. The rule in question, which was for the reason above stated overlooked by us, has no material bearing on the case. This is the view entertained by counsel both in the court below and in this court when the case was submitted. As the first position taken by counsel in reference to this rule was so clearly correct, we do not deem it proper to grant a rehearing for the purpose of allowing a contrary view to be set up and attempted to be sustained.

*Application for rehearing denied. All the Justices concurring, except Lewis, J., absent.*