## JACKSON *v.* GEORGIA SOUTHERN AND FLORIDA RAILWAY COMPANY.

1. By the Civil Code of 1895, § 5536, par. 1, as it stood prior to the act of 1905 (Acts 1905, p. 84), provision was made for bringing up parts of the record to this court in addition to those specified in the bill of exceptions, including evidence contained in a brief of evidence forming part of such record.
2. The act of 1905 provided that in any case in which no brief of evidence is made and filed as a part of the record, if there is omitted from the main or cross-bill of exceptions any material evidence, and the judge trying the case shall inadvertently certify such bill of exceptions as true, within twenty days from the service thereof he may make a supplemental certificate of the evidence so omitted, and such supplemental certificate, together with the evidence so certified, shall form a part of the original main or cross-bill of exceptions, and shall be so considered by the Supreme Court, and such supplemental certificate shall be filed with the clerk of the trial court and be immediately transmitted to the Supreme Court as bills of exceptions are transmitted.
3. The section of the code referred to in the first headnote made provision for cases where a brief of the evidence was filed as a part of the record. The act of 1905 provided for supplementing the evidence contained in the bill of exceptions, where material evidence had been omitted. Neither of these laws authorized the making up of an entirely new brief of evidence, causing it to be filed in the superior court, as a part of the record, after the bill of exceptions had been signed and the case had been brought to this court, and the causing of such a brief to be transmitted to this court, as a part of the record, to be taken in lieu of the evidence contained and certified in the bill of exceptions.

4. This being a suit for the homicide of a fireman in the employment of a railroad company, under the evidence introduced it was error to grant a nonsuit.

Argued April 7, 1908.—Decided February 20, 1909.

Action for damages. Before Judge Mitchell. Lowndes superior court. November term, 1907.

Mrs. Josephine Jackson brought suit against the Georgia Southern and Florida Railway Company to recover damages for the homicide of her son, Richie Jacob Jackson, on whom she alleged that she was dependent for a support at the time of his death. On the trial the evidence of the principal witness for the plaintiff, in regard to the manner in which her son met his death, was in substance as follows: Witness is an engineer in the employment of the defendant, and was so at the time of the death of plaintiff's son. The latter came to his death as the result of the collision of two engines of the defendant company in its yard in the city of Valdosta, on the sixth day of April, 1905. It was early in the morning, just before daylight, and about half an hour after witness as engineer, and Jackson as fireman, upon an engine of the defendant company, had been called and had gone on duty. Witness was engineer upon an engine which pulled a freight-train from Valdosta to Jacksonville and return, a distance of one hundred and eleven miles. Jackson was a fireman in the employment of the same company, and as such fired the engine upon which the witness made his run, and for and under the witness. About thirty minutes before Jackson's injury and death they mounted the engine preparatory to connecting with the train to make the trip to Jacksonville. The engine was in the eastern part of the train yard of the company in Valdosta, not far distant from the passenger-depot. The yard extends in a western direction about three quarters of a mile from the depot, and within the yard limits was what was known as the workshop of the company. At this shop engines are kept, and to it are carried after trips upon the road, and from it are taken preparatory to making trips. At this workshop was kept the equipment of the engines. The hostler had brought the engine to the place in the yard above mentioned, and had left it there for the engineer and fireman, who had taken charge of it, and he had gone back to the workshop. The engineer discovered that the cushion for him, which was a part of the

equipment of the engine and provided by the company as such for the use of the engineers in making these long trips, had not been placed in its customary and usual place. The hostler who brought the engine from the western part of the yard, at the workshop, to the eastern part of the yard, failed to place the cushion upon the engine, as it was his duty to do. The engineer called Jackson's attention to this fact, and told him that he (the engineer) would have to go back to the shop and get the cushion. "At my suggestion he agreed to go with me." It is true that the cushion which the engineer was using at the time was one which he had made for himself, and was better than that furnished by the company to all of its engineers, and it was adopted and used in lieu of the company's regular cushion. When the engineer notified Jackson of this, the latter remarked that he had omitted to bring his pants, and without them he could not go up town upon reaching Jacksonville. Previously to this and until recently he had been living not far from the workshop. The witness did not know where he lived at the time of his death. If he lived at that time at the boarding-house of Mrs. Paxton, when going with the engineer upon the engine to the workshop he was going in a direction away from his boarding-house. (Mrs. Paxton testified, that, at the time of his death, Jackson was boarding at her house toward the eastern part of the railway yard, and that his clothes and other possessions were at her house; that he had been called to go on duty that morning about an hour before he was killed; and that when the collision happened he was going in a direction away from her house.) The engineer started back to the workshop, after the statement to Jackson; and Jackson, knowing his purpose, accompanied the engine. The engineer had no headlight to go upon the back of his engine; none was furnished by the company; but he told Jackson to use a torchlight from the window upon his side of the cab of the engine, and to look out upon that side, "the torchlight to be the signal." Jackson proceeded to do this, and to turn the switches, on the trip with the engine. Before starting back, the witness blew three long blasts of the whistle, which was the usual, customary, and known signal to all engineers and employees in the yard that the engine which he was on was backing. This signal could be easily heard anywhere within the yard limits from where the engineer was. After giving this sig-

nal, the engineer proceeded, with Jackson, to back the engine toward the workshop for the purpose stated. Witness observed the rule of the company, which required all engines and trains to move within the yard limits of the city at a speed of not exceeding six miles an hour. On approaching the point where the track of the Valdosta Southern Railway Company intersects and crosses the track of the defendant company, the engineer blew the usual and required signals with the whistle, indicating the approach of his engine to this crossing, and slackened the speed of the engine until it came to a stop fifty feet from the point of the intersection of the two tracks. The engineer was at his post, and Jackson was at his, looking out and holding the torchlight, according to the engineer's direction. They were about 200 or 250 yards from the workshop. The track curved sharply ahead of them to the right, and in the bend was a fence, and some little distance from the track was a house. The main line of the company, running from Valdosta to Palatka, ran north and south, and the track which they were on curved ahead of them and intersected with the main line, "and when an engine was upon the main line or upon the side-track at the workshop with the light reflected from the headlight of the engine at the workshop as it shined down the main line." Suddenly, and after the signals had been given as stated, and while the engine on which the witness and Jackson were was at a stop 50 feet east of the crossing of the tracks, witness saw a light, from the headlight upon the engine which appeared to be about the workshop, turn easterly. He could not see the engine, but the light which shone down the track towards the south could be seen casting itself easterly, which indicated that the engine was coming around the curve. Witness turned to Jackson to tell him to look out, and scarcely had time to do so. Jackson undertook to get off of the engine, but almost instantly the other engine struck it with great force, crushing him and causing his death. The hostler had come with the other engine from the workshop, and had run into the engine on which witness and Jackson were. In the opinion of the witness, the other engine was running not less than ten miles an hour. This happened within the yard limits. The hostler, upon his engine around the curve, could see the engine of the witness between 250 and 300 feet. An engine running not exceeding six miles an hour can be stopped within 20 or

30 feet. The hostler was carrying the engine in question from the workshop to the passenger-depot, to be used in pulling a passenger-train which was to go out later from that point; but the witness and Jackson had ample time to go to the workshop, get the cushion and go back before the time for the train to depart. They had thirty minutes. In going back to the workshop the sole purpose of the engineer was to get the cushion for his engine. "I considered that my business, and not the company's." It was customary and usual for witness and other engineers in the yard in which the engines were kept, after they had gone on duty, to move those engines at will to different points in the yard, so long as they did not go out of the yard, and so long as they observed the regulation speed and gave the required signals. No headlight was ever furnished the witness for this purpose by the company, to be used in backing. This rule and custom were known by the company, and known by the yardmaster, who had control of this yard. The hostler usually brought engines over to the eastern side of the yard for outgoing trains, and would carry back engines bringing in trains at any and all times; and invariably furnished cushions for the engines as provided by the company, but failed to do so on this particular occasion. There was other evidence tending to show the age and earning capacity of the deceased, and the assistance rendered by him to his mother. At the close of the evidence for the plaintiff the court granted a nonsuit, and the plaintiff excepted.

*W. E. Thomas, S. A. Roddenbery,* and *Roscoe Luke,* for plaintiff.
*John I. & J. E. Hall* and *Cranford & Wilcox,* for defendant.

LUMPKIN, J. (After stating the foregoing facts.)

1-3. The bill of exceptions tendered by the plaintiff was signed December 17, 1907, and was filed in the office of the clerk of this court on December 27. On January 2, 1908, a petition was presented to the judge, which alleged, that almost thirty days after the grant of the nonsuit one of the plaintiff's counsel dictated from memory the brief of evidence contained in the bill of exceptions which had been certified by the presiding judge; that such brief was not made from the stenographic report of the official court stenographer, although the case was reported in detail by him, but was made up entirely from the memory of the attorney; that it was not a correct brief of the evidence adduced at the trial

of the case, but was inadvertently certified by the judge as true'; that no separate brief of evidence was filed, but the bill of exceptions purported to contain the evidence; that the defendant had procured from the official stenographer a transcript of the evidence adduced at the trial, and had made a brief thereof which was presented with the petition for approval; that it was practically impossible to present only a supplement to the brief of evidence as contained in the bill of. exceptions, and therefore it was prayed that the brief of evidence then presented be certified and that the clerk be required to transmit such brief to the Supreme Court "after the same has been approved and made a part of the record in said case." The presiding judge passed an order stating that he certified that the allegations in the petition were true, and that the brief of evidence to which this certificate was attached was a true and correct brief of the evidence, oral and documentary, adduced at the trial of the case; that it was impossible simply to supplement the brief as contained in the original bill of exceptions, and he therefore ordered the full and correct brief of the evidence to be transmitted to the Supreme Court "as a part of the record in said case." It was ordered that the attached brief be filed as a part of the record, and that the clerk be directed to make out "a true copy of said brief, together with a true copy of the petition and of this order and certificate, and certify the same as such, and transmit the same to the Supreme Court of Georgia, to be considered as part of the record in said case, which was carried to the Supreme Court of Georgia upon bill of exceptions sued out by Josephine Jackson as plaintiff in error." In accordance with this order the clerk transmitted to this court, on January 10, a certified copy of such order and certificate and also a certified copy of the brief of evidence which appears to have been approved by the judge and ordered filed as a part of the record on January 2.

Prior to 1905 the Civil Code, §5536, par. 1, only provided for transmitting to this court additional portions of the record which had not been required to be sent up by specification made by the plaintiff in error. If a brief of the evidence had been approved and filed as a part of the record, it could be transmitted on application and order as other desired portions of the record might be. The authority of the judge was confined to ordering "the whole or any part of the record sent up by the clerk." There was no authority.

for sending up evidence which did not form a part of the record, or for creating an additional record by making up and filing a brief of evidence after the case had been carried to the Supreme Court. The act of 1905 (Acts 1905, p. 84) amended the section above cited, by adding thereto the following language: "And if from the main or cross-bill of exceptions, in any case in which no brief of evidence is made and filed as a part of the record, there is omitted any material evidence, and the judge trying the case having inadvertently certified said bill of exceptions as true, then within twenty days from the date of the passage of this act as to cases now pending, and within twenty days from the date of service of bill of exceptions in all future cases, the trial judge may, on his own motion, make a supplemental certificate of the evidence so omitted, and said supplemental certificate, together with the evidence so certified, shall form a part of said original main or cross-bill of exceptions, and be so considered by the Supreme Court; and immediately upon the filing of said supplemental certificate with the clerk, he shall transmit same to the Supreme Court, in the same manner as now provided for with reference to transmission of bills of exceptions." This provided for cases where there was no brief of the evidence filed. Thus the section of the code as it stood before this act was passed made provision for sending up additional evidence as a part of the record, where it was a part of the record. This act made provision for sending up additional evidence omitted from the bill of exceptions, where such evidence was not a part of the record by reason of having been filed as a brief of evidence. It authorized a species of amendment to the bill of exceptions by adding evidence omitted from the original bill or cross-bill. It never contemplated that, after the case had been brought to this court, additional record should be made in the superior court by making up and filing there a brief of evidence which had never existed before, and causing it to be transmitted by the clerk as a part of the record for consideration by this court. The omitted evidence is to be certified by the judge, filed with the clerk, and transmitted by the latter to this court as an addition or supplement to the bill of exceptions. The paper brought to this court should have upon it the sanction of the judge's signature, as the bill of exceptions should have. The clerk should certify and transmit the original paper signed by the judge,

not a copy of it. Here no brief of evidence had been filed at the time when the bill of exceptions was certified and transmitted to this court. There was no record containing the evidence, and it could not be required to be sent up as additional record, under the provisions of the code prior to the act of 1905. What purports to be a brief of evidence, which it is desired to practically substitute in lieu of the evidence set out in the bill of exceptions, was not sent up as provided by the last-mentioned act. The effort was to make additional record after the case had left the trial court, and have it sent up to this court as record. The additional evidence does not come here over the judge's original signature, as the act of 1905 contemplated, when it allowed him to correct omissions in the evidence contained in the bill of exceptions. He approved a brief of the evidence, and directed it to be filed with the clerk of the superior court, and to become a part of the record of that court; and that a certified copy thereof and of his order and certificate be transmitted to the Supreme Court. This was not a compliance with the act of 1905. The Civil Code, §5529, declares: "If the plaintiff in error shall so elect, he may have such brief of so much of the evidence as is necessary to a clear understanding of the errors complained of, approved by the judge, and made a part of the record and sent up by the clerk as a part thereof, rather than have the same incorporated in the bill of exceptions." But this must be done before the bill of exceptions is signed, so that such brief of evidence may be specified to be sent up as a part of the record then existing. It does not authorize the plaintiff in error to tender and have certified a bill of exceptions, and afterwards make up his brief of evidence. A fortiori, it does not authorize the defendant in error, filing no cross-bill, to prepare and have filed as a part of the record a brief of the evidence, after the bill of exceptions has been signed. Moreover, the act of 1905 provides that where there is omitted from the main or cross-bill of exceptions any material evidence, and the judge has inadvertently certified such bill of exceptions as true, within twenty days he may make a supplemental certificate "of the evidence so omitted." This does not seem to contemplate that the judge may certify as true and correct a bill of exceptions containing a brief of the evidence, and then, on application of the defendant in error, may practically withdraw the evidence

certified in the bill of exceptions and substitute therefor an entirely new and different brief of the evidence as a whole. It is supplementation, not eradication and substitution, which the act allows. The law provides that the judge shall correct the bill of exceptions before certifying it, so as to make it conform to the truth and contain the evidence. Civil Code, § 5528, par. 3. The act of 1905 did not proceed on the theory that what had been certified was totally wrong, but that by inadvertence something might have been omitted. If omitted evidence is so interwoven or connected with that which is certified as to be unintelligible if certified alone, and to render it practically impossible to do so, it is not necessary now to hold whether, in the manner pointed out by the act of 1905, the brief as a whole might be sent up, so as to be in consistent and intelligible form. But what has been sent to this court as a new or additional brief of evidence, and as part of the record, substantially to be substituted in lieu of the evidence certified in the bill of exceptions, can not be considered by this court. We are compelled to deal with the case upon the evidence duly certified and brought before us.

4. Dealing with the case in the light of the evidence as set out in the bill of exceptions, was the court correct in granting a nonsuit? Before proceeding to call attention to some features in the evidence which sustain our view on this subject, it may be well to state two or three fundamental principles, which must not be lost sight of. The Civil Code, § 5347, declares as follows: "A nonsuit is not granted merely because the court would not allow a verdict for plaintiff to stand. But if the plaintiff fails to make out a prima facie case, or if, admitting all the facts proved and all reasonable deductions from them, the plaintiff ought not to recover, a nonsuit will be granted." Questions of diligence or negligence are peculiarly matters for the jury, and a court ought not to take the place of the jury in solving them. What has been aptly termed "the mechanical process" of a nonsuit, by which the plaintiff's cause is cut off as matter of law, ought not to be applied when the jury, from the facts proved and all reasonable deductions from them—deductions which may be legitimately made by the jury, might find the issue of diligence or negligence in favor of the plaintiff. Even if the judge were justified in a given case, by an overwhelming preponderance of evidence for the defendant,

in thinking that the jury should not find for the plaintiff, but rather for the defendant, this would give him no right, without the aid of the jury, to decapitate the plaintiff's case with a nonsuit. If the jury err, the presiding judge has a discretionary power in reference to granting a new trial,—a power which sometimes it is his duty to exercise. But it is only in clear cases, where, admitting all the facts proved and all reasonable deductions from them which the jury might make, the plaintiff would not be entitled to recover, that the judge ought to decide the question of diligence or negligence arising under the evidence, without the aid of a jury.

If the engineer would not have been so clearly precluded from recovering, had the suit been brought by him, as to authorize a nonsuit, it would seem clear that the fireman was not in that position. But even if the engineer was guilty of some negligence, it does not follow as matter of course that the fireman was likewise negligent. It may be contended that the engineer was acting out of the scope of his employment in going back after the cushion; that if this be not so, he adopted a more dangerous method of securing the cushion by going back for it upon the engine rather than on foot; and that the fireman, in accompanying him, was not free from fault. In these views we can not concur. The engineer testified: "I had been on duty about a half an hour, and so had Richie Jacob Jackson. . . About thirty minutes before his injury and death as stated, we mounted our engine preparatory to connecting with the train to make the trip to Jacksonville." The witness was the engineer of the company, and Jackson was the fireman on the engine, "and for and under him." The hostler had brought the engine from the shop and delivered it to the engineer and fireman. It thus appears that they had entered upon the discharge of their duty, by taking the custody of it in the yard, not far from the depot. The hostler had left the engine and gone back to the shop, which was also in the yard. The equipment of engines was kept in the workshop and carried there after trips upon the road and taken thence preparatory to making trips. The engineer testified that the cushion was "a part of the equipment of the engine, and provided by the company as such for the use of the engineers in making long trips;" and while the particular cushion then being used had been made by the engineer, it had been accepted and used in lieu of one originally furnished by the

company. Whether or not the cushion was an important or regular part of the equipment was a question of fact for the jury, under the engineer's testimony. The duty of furnishing proper appliances is one of the non-assignable duties of the master; and it would seem that if the cushion was in fact a part of the equipment of the engine, and was recognized by the master as such, the duty to furnish it was the duty of the master, whether performed personally or by one of the employees. In the case of a corporation it must be performed in the latter manner. If the duty was that of the master, the failure to discharge it was a dereliction on the part of the master. If the failure be treated as that of a fellow-servant, the strict rule of the common law, prohibiting recovery for an injury brought about by the negligence of a fellow-servant, has been modified in this State as to railroad employees. Civil Code, §§ 2323, 2297. Here were an engineer and fireman to whom had been delivered the custody of an engine, who had taken charge of it and were on duty handling and operating it. It was standing in the yard, not attached to a train. To say that if the engineer moved the engine forward he was acting as an employee of the company, but if he moved it backward he was not acting as an employee of the company, is unsound. He testified that "It was customary and usual for me and other engineers in the yard in which the engines were kept, after we had gone on duty, to move those engines at will to different points in the yard, so long as we did not go out of the yard, and so long as we observed the regulation speed and gave the required signals. . . This rule and custom was known by the company and known by the yardmaster, who had control of this yard." The cases which deal with the situation of a mere licensee, or of one who was merely permissively upon an engine without any business or duty there, or similar cases, have no application to this situation. In this case the employee of the railroad company whose duty it was to run the engine was in charge of it. According to his testimony, in such cases engineers were allowed some latitude in moving an engine in the yard, so long as they did not leave it, and provided they gave the customary signals. How could they be required to give customary signals, if not considered on duty? He was going on the company's engine during his hours of employment, and while in charge of it, to get a part of the equipment in connec-

tion with his run.    Whether he was negligent or at fault is another question.    But the facts do not, as matter of law, authorize a declaration that he was a mere licensee.    This is not the case of a mere permission to a stranger or to an agent who had no right to be upon the engine at all or to manage it, but rather an allowance by the master of some discretion on the part of the employee in charge of its engine, while within the yard limits.    Suppose that, while the engineer was running this engine through the yard, he had collided with a passenger-train, causing injury to passengers, or had run over a stranger who was in the yard for some lawful purpose, could the company have escaped liability by contending that the engineer, while going back for a part of the equipment which it had failed to furnish on the engine, was acting outside the scope of his employment and that the company was not liable for injury done by him in the handling of its engine?    The company would undoubtedly have been responsible for its engineer's conduct—not as a mere licensee, but as an employee.    Is it not clear that the engineer was acting as the servant of the company, and that the question is not one of acting beyond the scope of his employment, but whether he acted negligently in connection with his employment?    The engineer further indicated that he was acting in accordance with his employment, in other portions of his testimony.    Thus he said:    "Before starting back, I blew three long blows of the whistle on my engine, which was the usual, customary, and known signal to all engineers and employees in the yard that the engine I was on was backing back. . . I observed the rule of the company, which required all engines and trains to move within the yard limits of the city at a speed of not exceeding six miles an hour. . . I was at my post, and Jackson was at his, looking out and holding the torchlight according to my direction."    In the face of this testimony we do not see how it is possible to hold, as matter of law, that the engineer and fireman were acting beyond the scope of their employment, when the injury happened.

Can it be said as matter of law that they were guilty of such negligence as to bar a recovery on account of the death of the fireman?    As already stated, the engineer testified that the cushion, which was a part of the equipment of the engine, was left at the shop, when the hostler brought out the engine and delivered

it to the engineer. The run was from Valdosta to Jacksonville and return, a distance of one hundred and eleven miles. Possibly the engineer might have made this trip without any cushion. Possibly he might have made it without any seat at all. If the oil can had been left off the engine, he might have gone on and left that. Possibly, if the headlight had not been in order, he might have ventured forward without having that defect corrected. It is not easy to say how many different parts of the engine's equipment might have been left behind, and still the engineer could have gone forward, though at some inconvenience and with some difficulty. But, in view of the custom and latitude allowed to engineers, as already shown, it can not be declared by the court that when some useful and convenient part of the equipment of the engine was left off of it, and this was discovered by the engineer in ample time to have it corrected, he was guilty of negligence, as matter of law, in going back to the shop for that purpose. He testified that he gave all the necessary and usual signals, ran his engine in accordance with the rule, and had ample time before the departure of his train to go to the shop and return. What should the judge have declared as a proposition of law that the engineer should have done? Should it have been announced that the engineer was bound to proceed on the journey without a cushion? Or should it have been laid down as a rule of law that (the hostler having gone) the engineer should have left his engine standing on the track in the dark, to take care of itself, or in the charge of the fireman, while he went back on foot among the tracks in a railroad yard to the shop and returned with the cushion,—a proceeding which might have been far more dangerous both to the engineer and to the engine than the method which he adopted? Or what would the law declare was the specific thing that the engineer ought to have done, in order to be diligent, or in order not to be negligent? These are questions of fact, and ought to have been submitted to the jury.

But if it should be conceded that the engineer was guilty of negligence, can it be declared, as matter of law, that the fireman was also guilty of such negligence as to preclude a recovery by his mother for his homicide? It was his duty to fire the engine for and under the engineer. He had gone on duty, when the hostler had delivered the engine to the engineer and himself, and had de-

parted. The engineer discovered that the cushion was not on the engine, and determined to go back with the engine to the shop in the same yard where they were standing, in order to procure it. The fireman could not have prevented his doing so had he desired. It was known to the employees, doubtless including the fireman, that engineers were allowed to move their engines about the yard, provided they did so in a certain manner. When the engineer started back to the shop, can it be declared, as matter of law, that the fireman should have left his engine, and deserted his post of duty thereon? What does the law specify that he ought to have done? Should he have stood in the midst of the railroad yard and tracks in the dark, before day, while the engineer went to the shop and returned? Would not this have very much increased the risk to the company's property, if he had declined to turn the switch and hold the signal-light, as there was no headlight on the rear of the engine? Should he have gone to the depot? Or should he have quit the service of the company altogether, if he thought the engineer was not acting for the best? Before it could be held that he would have been barred from recovering had he lived, or that his mother was barred from recovering for his homicide, it was necessary that he should have been guilty of negligence substantially contributing to the injury. Whether remaining on the engine and seeking to aid in safely making the trip by holding a signal-light amounted to negligence on his part, under the circumstances disclosed by the evidence, was a question for the jury, not for the court. It can not be said as a matter of law that whenever a fireman thinks that an engineer is not controlling an engine exactly as he should, or is not fully discharging the duties of his position, the fireman must leave his post of duty at once or take all the risk of whatever may happen. It has been held, in effect, that where an engineer went to sleep, whether or not the fireman was guilty of negligence in not awakening him promptly, or taking other precautions for his own safety, was a question of fact for the jury to determine. *Carroll* v. *East Tennessee &c. Ry. Co.*, 82 *Ga.* 452 (10 S. E. 452, 6 L. R. A. 214). The question arose on a charge of the court, but the effect of the decision was that the jury, not the court, should decide what due care required of the fireman.

Remembering that our code declares that if the person injured is himself an employee of a railroad company and the damage was caused by another employee, and without fault or negligence on the part of the person injured, his employment by the company shall be no bar to the recovery (Civil Code, §2323), and that we have endeavored to show that it can not be declared, as matter of law, that the fireman who was killed was guilty of negligence precluding a recovery, let us see if there was negligence on the part of. other employees, causing the injury. Aside from the presumption which arises if the injured employee is without fault, the evidence on this subject required the determination of a jury. The omission of duty to place the cushion upon the engine has already been mentioned. The evidence shows that all engines and trains were required by the rule of the company to move within the yard limits at a speed of not exceeding six miles an hour; that as the engine was backed the torchlight was held as a signal, and the usual signals by blowing the whistle of the engine to indicate that the engine was starting back were given. Between the point from which the engine started and the shop the track of another railroad company crossed that of the defendant. On approaching this crossing and when fifty feet from it the engineer stopped his engine. In the meantime the hostler had returned to the shop and got another engine to be carried to the station for use in connection with another train. He ran this engine around the curve at a rapid speed, not less than ten miles an hour, in spite of the rule which prohibited him from running more than six miles an hour within the yard limits. He did not stop at the crossing of the other railroad track, but ran on around the curve, crashing into the engine on which Jackson was, before he could escape from it, thus causing the death for which this suit was brought. The engineer testified, that "the hostler upon his engine around the curve could see my engine between 250 and 300 feet; an engine running not exceeding six miles an hour can be stopped within twenty or thirty feet." If this was true, the hostler was palpably guilty of negligence, not only with respect to other trains of other railroads, but also with respect to others who might be in the yard, and for whose protection the rule was made. If the evidence showed negligence of another employee of the company, causing the injury, then a presumption of freedom from fault

arose in favor of the injured employee. *Central R. Co.* v. *Kelly,* 58 *Ga.* 107 (5).

The evidence was sufficient to show negligence on the part of other employees of the railroad company, if not of the company itself,—negligence relative to other employees in the yard or who might be there, resulting in the death of the fireman; that he was on the engine where it was his normal duty to be, and where his employment required him to be; and that he was guilty of no negligence, unless remaining on the engine when the engineer went back to the shop to get a cushion, which he testified was a part of the proper equipment of the engine, was per se negligence in law. We are unable to see how, as matter of law, it can be declared that this fireman was guilty of negligence which barred a recovery for his homicide.

Cases can easily be cited to the effect that where an employee of a railroad company violates a rule, or leaves a position where he ought to be, and goes to a place where he has no business to be, and thereby an injury accrues, he can not recover. Instances of this character of cases are, *Sears* v. *Central R. Co.,* 53 *Ga.* 630; *Central Railroad* v. *Sears,* 59 *Ga.* 437, 61 *Ga.* 280; *Chattanooga R. Co.* v. *Myers,* 112 *Ga.* 237 (37 S. E. 439); *Atlanta & Charlotte Air-Line Ry. Co.* v. *Ray,* 70 *Ga.* 674; and other similar cases. In the *Sears* case it was not the duty of the conductor of a freight-train to couple and uncouple cars, except in case of a pressing emergency, of which it was declared the jury must judge; and it was held that if he was killed in performing such service, in the absence of such emergency, he was not without fault. In the *Ray* case a flagman, whose general place of duty was in the rear car of a train, was injured by the overturning of a stove in another car; and it was held that it was necessary for him to show that, at the time he was hurt, his duty required him to be at the place where the injury occurred. In the *Myers* case a brakeman was riding on the locomotive pulling the train, in violation of a duty devolving on him to be elsewhere, and while he was thus violating his duty he was injured. It was held that he was not without fault. A comparison of the facts involved in such cases with those in the case now before us will show a plain distinction. Besides, it is to be noted that in the *Sears* case, though it was three times before this court, and new trials were awarded, it was held

that the question of emergency was for the jury, and neither this court nor the trial court directed a nonsuit. It should not have been done in this case.

*Judgment reversed. All the Justices concur, except Evans, P. J., and Holden, J., who dissent.*

HOLDEN, J. The writer does not concur in the ruling made by a majority of the court, that the trial judge committed error in awarding a nonsuit. The writer concurs in the other rulings by the majority, but, on account of his belief that the judgment of nonsuit was proper, must dissent from the judgment of the court reversing the judgment of the lower court. The plaintiff brought suit against the defendant company for damages on account of the homicide of her son, who, while in the employment of the defendant as a fireman, was killed in the yards of the defendant company at Valdosta, Ga. If the deceased was at fault, and such fault contributed in any appreciable degree to his death, there can be no recovery by his mother for his homicide. From the evidence contained in the bill of exceptions (which is the only evidence in the record which can be considered), it appears that it was the duty of the hostler to bring engines from the workshop in the yards to another portion of the yards, where such engines were taken charge of by the crews thereof, who attached them to outgoing trains; and it was the duty of the hostler, when an engine was to be used for long hauls, to place thereon a cushion for the engineer to sit upon while operating the engine, such cushion being a part of the equipment of the engine. In this instance the hostler failed to put the cushion on the engine. The engineer, upon discovering its absence, so notified the fireman and undertook to back his engine to the workshop to get the cushion, and, at his suggestion, the fireman agreed to accompany him. This engine, while being used on this mission, was run into by another engine which the hostler was bringing through the yards from the workshop, and in the collision the fireman was killed. It nowhere appears from the evidence that it was the duty of the engineer, or any one else, to procure this cushion when the hostler failed to place it on the engine. The only person on whom the duty of placing the cushion on the engine rested was the hostler. When the engineer, therefore, undertook to back his engine to the workshop to get the cushion and place it on the engine, he was

making a trip to perform a duty which rested on the hostler, and on no one else, so far as this record discloses. There is nothing in the evidence to show that it was any one's duty to procure this cushion when the hostler failed to provide the engine with it when he brought the engine out of the shop, and there is nothing in the evidence to show that the engineer was performing any duty imposed upon him as an employee of the road when he undertook to back his engine to the shop for the purpose of procuring the cushion. The fact that the hostler failed to discharge his duty in placing the cushion on the engine did not devolve this duty on the engineer, or any one else. The engineer testified that he was at his post, but he also testified that he considered going after the cushion as being his own business and not that of the company. He was at his post if he was on his engine, as that is the place for an engineer; but construing all of his testimony together, it means that he was at his post on his engine, but attending to business and going on a mission of his own, and not for or in the interest of the company. The engineer would have been justified in getting the cushion and placing it on the engine, if there was any necessity or emergency for this to be done, although there was ordinarily no duty on him to do so. But in this case it does not appear that there was any necessity or emergency on the engineer to procure the cushion. It nowhere appears that the cushion was such part of the equipment of the engine as made it necessary to have it in order to operate the train to Jacksonville, even if such fact would have created an emergency justifying the engineer in going for the cushion, especially with an engine. As far as this record discloses, the cushion was simply for the comfort and convenience of the engineer. The record failing to disclose that it was necessary for the cushion to be had in order for the train to leave Valdosta and be operated to its destination at Jacksonville, but showing that it was simply a matter of comfort and convenience to the engineer while operating the train, it certainly can not be said that there was any emergency on the engineer at the time to back his engine to the shop for the purpose of getting the cushion.

The master has the right to classify his business and assign specified duties to different employees. One employee has no right, except in cases of emergency, to perform the duties of another. When he is killed while performing the duties of another employee,

as the result of negligence of a coemployee, not wanton or wilful, there can be no recovery from the master. If it was necessary to obtain the cushion for the engine, the engineer had ample time to walk to the workshop, secure it, and return with it before the time for his train to leave arrived, and it was not of such weight or bulk that it could not easily have been carried by him in person from the shop to the engine. If it is true that it was the duty of the engineer ordinarily, or by reason of an emergency, to get the cushion himself before the train left Valdosta, no excuse is shown why the more dangerous way of getting it by backing the engine early in the morning before daylight, with no lights on the back thereof, through the yards on a track with a sharp curve therein and where other engines were liable to be, was adopted instead of the obviously less dangerous one of securing it by walking back for it. There is no evidence that the engine-house could not be approached by one on foot without walking on the tracks of the railroad. As far as this record discloses, the only way provided for the hostler to go back to the engine-house after bringing out engines was by walking. The fact can no more be disputed that an individual could walk away from and off the track of a railroad to the engine-house to get a cushion, with less danger than he could run a locomotive backward, before day and without a headlight, over the tracks for this purpose, than it can be disputed that an individual can travel on foot without walking on railroad tracks, or that a railroad locomotive can not travel off the railroad tracks. Nor is there any evidence which can make it doubtful that the engine, the property of the company, was in less danger in taking the perilous journey to the workshop than it would have been standing still where the hostler left it, guarded by the fireman, if need be, during the few minutes required for the engineer to go to the engine-house and get the article he wanted for his personal convenience. In *Central R. Co.* v. *Mosely*, 112 *Ga.* 914, 917 (38 S. E. 315), it is said: "It is a well-settled principle of law that where an employee is confronted with two methods of performing his work, the one safe and the other dangerous, he owes a positive duty to his employer to pursue the safe method, irrespectively of the degree of danger which may be involved in the unsafe method; and any departure from the path of safety which lies before him will prevent his recovery in the event that he is injured. We

therefore hold that the court below erred in so qualifying the rule here laid down as to practically instruct the jury that no negligence short of rashness would defeat a recovery by the plaintiff." In *Quirouet* v. *Ala.ⁱ Great So. R. Co.*, 111 *Ga.* 315, 318 (36 S. E. 599), it is said: "The use of the more dangerous method, even though it be one of greater convenience, would preclude a recovery if injury results." In *E. T., V. & G. Ry. Co.* v. *Head,* 92 *Ga.* 723, 725 (18 S. E. 976), it is said: "Certainly, if he could get a view of the journal without exposing himself to danger at all, he ought to have done so. The evidence is clear, strong, and undisputed that, without leaving his seat in the cab, and without subjecting himself to any peril whatever, he might have seen the hot journal fully as well as from the position he actually assumed. To look at the journal from his seat would, it is true, have required a slight inclination of his head outside of the window of the cab, but not enough to bring his head in contact with the post, or in such proximity to it as to be dangerous. Inasmuch, therefore, as there was a way in which he could have performed his duty with respect to the hot journal with absolute safety, and he disregarded the safe method of so doing and adopted another which was in the highest degree dangerous, he was certainly guilty of some contributory negligence; and this being so, his widow had no right to recover from the company."

The engineer testified as follows: "The hostler who brought the engine from the western part of the yard, at the workshop, to the eastern part of the yard, as stated, failed to place it upon the engine as it was his duty to do. I called Jackson's [the fireman] attention to this fact, and told him I would have to go back to the workshop and get the cushion; at my suggestion he agreed to go with me." The evidence shows that the fireman had knowledge of the fact that the only purpose of the engineer in going with his engine to the workshop was to procure this cushion. He agreed to go *simply at the suggestion of the engineer.* He knew, too, that the trip was attended with danger, as he held a signal-torch out of the cab of the engine at the request of the engineer, and was so holding it at the time the approaching engine was first sighted by the engineer. If the fireman, *merely at the suggestion of the engineer,* agreed to go with him on a mission which was outside of the ordinary duties of the engineer, and involved no emergency

—being merely to secure a cushion for the comfort and convenience of the engineer in operating the engine to Jacksonville, can the fireman be said to be free from fault when he lost his life? As the making of this trip did not come within the ordinary duties of the engineer, and as there was no emergency requiring him to make it, there was no duty on the fireman to assist him in doing so, and when the fireman, merely at the suggestion of the engineer, undertook to assist him on such a mission, the object of which was known to the fireman from the outset, he was entirely out of the line of his duty and it can not be said that he was without fault which contributed substantially to his own death. In 4 Thompson on Negligence, 707, § 4677, it is said: "The law will not, on obvious grounds of justice, compel the master to pay damages which the servant has brought on himself by undertaking to do something which the master did not employ him to do, but will ascribe his calamity to his own unnecessary and gratuitous act." This is true "though his act may be well meant and his object to continue serving his master." 1 Shearman & Redfield on Neg. § 207. In undertaking, at the suggestion of the engineer, to assist on a mission of the kind above referred to, the act of the fireman, under the circumstances, was an unnecessary and gratuitous act on his part and one which was not imposed on him as an employee of the company. There is no evidence that the death of the fireman was the result of any wanton or wilful act of negligence on the part of the company, or any of its employees. There is no evidence that the engine on which the deceased was at the time of the collision was seen by any of the crew of the other engine before the collision occurred. The fact that the latter engine was running at a speed exceeding that permitted in the yards by the rules of the company, and that the other engine was not, and that the engineer of the latter before backing his engine gave the required signals, which could be heard anywhere in the yards, can make no difference under the view the writer takes of the plaintiff's rights. It makes no difference that the engine on which the deceased was had stopped before reaching another railroad crossed by the defendant's tracks, and that the other engine made no such stop. This latter fact, under no view of the case, could constitute negligence with reference to the deceased. *Holland* v. *Sparks,* 92 *Ga.* 753 (18 S. E. 990) ; *Atlanta & Charlotte Air-Line*

*Ry. Co.* v. *Gravitt,* 93 *Ga.* 369 (20 S. E. 550, 26 L. R. A. 553, 44 Am. St. R. 145); *Georgia & Ala. Ry. Co.* v. *Cook,* 114 *Ga.* 761 (40 S. E. 718).

If the engine on which the fireman met his death had, through the negligence of the crew thereof, killed some one, and if the company had been liable for such homicide, the fact that the company was liable for such killing can not change the logic of the situation. If an engineer, by reason of excessive speed, or through disobedience of orders, collides with a train, causing injury to a passenger thereon, the engineer would be violating his duty and could not recover for any injuries he might have sustained in such collision; but the fact that he was violating his duty would be ground for a recovery instead of defeating a recovery by the passenger. *As to any one other than the fireman and engineer* of the engine on which the fireman lost his life, the company would not perhaps be permitted to say, under the facts of this case, that its employees in charge of one of its engines and running it on the track of the company were not acting as employees of the company at the time. There are some authorities to the effect that employees in running an engine may be negligent in not keeping a lookout where persons may likely be on the track, and for such negligence alone the company will be liable for the homicide of a licensee, or even a trespasser, guilty of some negligence contributing to his death; but such doctrine can not apply where the person killed is an employee and was guilty of negligence substantially contributing to his death, as in the case under consideration. Whether the engineer and fireman, at the time of the death of the latter, were acting as licensees or employees, the plaintiff has no right of recovery under the evidence. Whether acting within or without the scope of their employment, the facts bar a recovery. The principle that the presumption that an injured employee was without fault arises when there is proof of negligence of other employees which caused the injury can not benefit the plaintiff, when it appears from the plaintiff's evidence that the fireman was at fault which substantially contributed to his death.

Nothing herein said affords even a suspicion that the obviously untenable position is assumed that when an employee runs an engine backwards he is acting without, and while he is running it forward he is acting within, the scope of his employment. The

fact that the engine was run backward instead of forward cuts no more figure in the case than the fact that it was run without a headlight in the dark, except the fact that the running of the engine backwards without a headlight before daylight in the yards, where other engines were liable to be running, was attended with great danger.

The fact that it was customary and usual for engineers in the yard, after they had gone on duty, to move their engines *at will* to different points in the yard, and that this custom was known to the company and the yardmaster, could not be said to operate so as to make the fireman without fault, under the circumstances of this case. In this connection, see *Chattanooga Southern R. Co. v. Myers*, 112 *Ga.* 237 (37 S. E. 439). In that case a brakeman left his post of duty on top of the cars and got on a locomotive, and while riding on it a derailment occurred which caused his death. On pp. 239-240, Justice Fish, who delivered the opinion, uses this language: "His mere permissive presence on the locomotive did not relieve him from the consequences of taking a risk which he voluntarily chose to assume in going there; the rule being that one who enjoys a permissive privilege does so with all the concomitant perils. 3 Elliott, Railroads, §§1267-1303. This is not a case of a trap or concealed danger, of which the company was bound to give notice. The danger of riding upon a locomotive was necessarily apparent to the deceased." In this connection see Cleveland, A. & C. Ry. Co. *v.* Workman, 66 O. St. 509 (64 N. E. 582, 90 Am. St. R. 582), where it was ruled: "An employee of a railroad company, whose duties in the performance of his employment do not require him to be on the main track of the railroad with a three-wheeled hand car, called a 'speeder,' but who goes upon the main track without any invitation or inducement therefor by the company, but with no objection on the part of the company, is, at most, a mere licensee; and his use of the track in such manner is subject to all the risks incident to the use of the track by the company in the same manner it was used at the time the license was granted, and the company does not owe him the duty to especially look out for and protect him when running its trains, except to use reasonable care and diligence to avoid injuring him after discovering him upon the track." The fact that it was customary and usual for engineers to move their engines at will at

different points in the yard, so far as the evidence discloses, was merely a permissive one; and when no duty was being performed, and no emergency existed requiring such movement, it can not be said that either the engineer or the fireman, while thus moving the engine, was doing any act for which he was employed when a collision occurred by reason of such engine being in a state of movement in the yards. The fact that it was customary and usual for the engineers to move their engines *at will* in the yard certainly could mean no more than that it was the custom to move them at will when performing some duty on the engines, and could not mean that it was the custom to use the engines to perform the duties of other employees, or to operate the engines in the yard for their own convenience or pleasure. In 3 Elliott on Railroads (3d ed.), §1303, p. 746-7, it is said: "If he goes into a place on the master's premises when he has no duty whatever at such a place, he enjoys a mere permissive privilege; and, at best, is a mere licensee; and if there be any liability to him, it is only for a breach of the duty which an owner of premises owes to a licensee. Upon the principle that an employer is not liable to an employee who voluntarily does work outside of the duties of the service required of him by his contract of service, it is held that there is no liability to an employee who works with a machine which he was not required to use, or uses a machine for a purpose for which it was not intended by the employer. If the employee is, at the time of the injury, reasonably within the line of his duty, he is within the rule that the employer is bound to exercise ordinary care to prevent injury to him because of defects in the working place or appliances, but he can not be justly said to be within the line of his duty when he is doing an act solely for his own convenience. Some of the cases rest the rule that the master is not liable for injuries to a servant, where the servant voluntarily goes into a place of danger into which his contract of service does not require him to go, upon the ground of contributory negligence; but it seems to us that the rule rests upon the principle that the master's specific duty does not embrace places into which the employee goes solely for his own convenience." For the engineer to use an engine in going after a cushion, or a pair of gloves, or a towel or drinking-cup, or some other article not necessary to have in running the engine, and which it was the duty of some other employee to

have placed in the engine, the engineer would be using the engine for a purpose not intended by the master. The engineer would be using the engine for his own convenience. The engineer would be using the engine to discharge the duty of another employee. The failure to place the cushion on the engine, whether it be considered the duty of the master or employee, as distinguished from that of the master alone, was not the proximate cause of the injury, and for this failure no liability exists. *Central Ry. Co.* v. *Edwards*, 111 *Ga.* 528 (36 S. E. 810). If it was the duty of the master, the fact barring a recovery still exists, that the death of the fireman was caused by his own negligence.

It is the duty of the master to furnish machinery reasonably safe. There is no allegation in the petition that it was not reasonably safe to operate the engine without a cushion. The hostler and engineer did run it without a cushion. The hostler neglected to place it on the engine when he was to run it from the shop to the passenger-depot. There is no complaint that the engineer did not have a place to sit. He had to have a place to sit in order to have a place to put the cushion. He went off hunting for a cushion to make the seat more comfortable. Did he have any right to endanger the property of his master and imperil his own life and the lives of others in hunting for a cushion in order to have a more comfortable seat? When the master furnished the engineer and fireman an engine *without a cushion,* but reasonably safe, the master's duty, under the law, was performed; and when the engineer went on a trip hunting for something to be used on the engine for his comfort and convenience while on the engine, after the engine had been furnished to him reasonably safe, he did something unnecessary to be done and something entirely for his own convenience. It appears from the evidence that the cushion was a part of the equipment of the engine, but there is no evidence whatever that the engine furnished the employee was not reasonably safe and equal in kind to that in general use, *without the cushion.* The law is that the master must furnish machinery and appliances reasonably safe and suitable for the purpose for which they are intended—not that he must supply the most approved patterns, those easiest of operation and best adapted for the use intended, or those which will afford the highest degree of convenience and comfort to the employee engaged in their operation; and when

the master has furnished the kind which the law imposes on him the duty to furnish, neither the right nor the duty devolves on the employee to go elsewhere and hunt better or more satisfactory according to his own ideas. See Civil Code, §2611. When the master furnishes an employee an engine reasonably safe, and the employee, being dissatisfied with it as furnished, drives it at night (without a headlight) through dangerous places on a hunt for something to use on the engine for his own convenience and comfort, and gets killed, the writer knows of no law which imposes on the master liability in damages for his death. The engineer, the plaintiff's witness, himself testified with respect to his going after the cushion: "I considered that my business and not the company's." A fireman who gratuitously and unnecessarily, simply at the suggestion of the engineer, and with knowledge at the outset of all the facts, assists the engineer in such search, is in no better position than the engineer. The question as to whether or not the fireman should, in all instances, leave the engine when he knows the engineer is improperly using it, is not in this case. Under the evidence, the fireman can be in no better position than the engineer. On the night of the accident the engine had not been moved by the crew thereof until it started on this trip after the cushion. The fact that the backing of the engine to the workshop was for the sole purpose of obtaining a cushion for the engineer was known to the fireman. The fact that this was not an essential part of the equipment of the engine, and that the engine furnished by the master to him and the engineer was reasonably safe to operate without such cushion, was apparent to the fireman. That there was danger attending the running of the engine in this particular instance was also known to him, as shown by the evidence that he held a torch out of the window of the cab as a signal of the whereabouts of the engine while it was backing to the workshop. The evidence discloses the fact that the fireman unnecessarily and gratuitously assisted the engineer in undertaking to secure the cushion in a way that was dangerous, when there was a way reasonably safe. The evidence also discloses that the fireman, in like manner, accompanied the engineer on a mission outside the line of his duty, and to perform a duty resting on the hostler, and that no emergency existed to justify his action. And the evidence further discloses that he, in like manner, assisted the engineer in employ-

ing the engine for a purpose for which it was not intended, but which constituted an improper diversion of its use to the personal service of the engineer. This unnecessary and gratuitous act of the fireman necessarily put the fireman in the position of performing an act not embraced in his contract of employment and in fault which substantially contributed to his death. *Sears* v. *Central R. Co.*, 53 *Ga.* 630; *Central R. Co.* v. *Sears*, 59 *Ga.* 437; *Central R. Co.* v. *McDade*, 59 *Ga.* 73; *Neff* v. *Broom*, 70 *Ga.* 256; *Atlanta & Charlotte Air-Line Ry. Co.* v. *Ray*, 70 *Ga.* 674; *Allen* v. *Hixon*, 111 *Ga.* 460 (36 S. E. 810); *Quirouet* v. *Ala. Great So. R. Co.*, 111 *Ga.* 315 (36 S. E. 599); *Hamilton* v. *Richmond & Danville R. Co.*, 83 *Ga.* 346 (9 S. E. 670); *Whilton* v. *South Carolina & Georgia R. Co.*, 106 *Ga.* 796 (32 S. E. 857); *Central R. Co.* v. *McWhorter*, 115 *Ga.* 476 (42 S. E. 82); *Carroll* v. *E. T., V. & G. Ry. Co.*, 82 *Ga.* 452 (10 S. E. 163, 6 L. R. A. 214); Mellor *v.* Merchants Mfg. Co., 150 Mass. 362 (23 N. E. 100, 5 L. R. A. 792); Olson *v.* Minn. & St. Louis Ry. Co., 76 Minn. 149 (78 N. W. 975 48 L. R. A. 796); Russell *v.* Oregon Short Line R. Co., 155 Fed. 22 (83 C. C. A. 618). In the opinion of the writer, the evidence in the bill of exceptions did not warrant a recovery, and the court committed no error in awarding a nonsuit.

The writer is authorized to state that Presiding Justice Evans concurs in dissenting from the judgment of the majority of the court in reversing the judgment of the trial judge awarding a nonsuit.